**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **PROTECT OUR DEFENDERS and** | : | **3:17-cv-02073 (VLB)** |
| **CONNECTICUT VETERANS LEGAL** | : | |
| **CENTER** | : | |
| **Plaintiffs,** | : | |
| | : | **July 12, 2019** |
| **v.** | : | |
| | : | |
| **DEPARTMENT OF DEFENSE and** | : | |
| **DEPARTMENT OF HOMELAND SECURITY** | : | |
| **Defendants.** | : | |

<u>**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 37]**</u>

Plaintiffs Protect Our Defenders ("POD") and Connecticut Veterans Legal Center ("CVLC") (collectively "Plaintiffs") brought suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of records withheld and redacted by Defendants Department of Defense ("DOD") and Department of Homeland Security ("DHS") (collectively "Defendants"). [Dkt. 1 (Compl.)]. Plaintiffs claim Defendants failed to conduct an adequate records search and withheld and redacted documents which did not fall within the asserted exemptions from disclosure under the FOIA. Before the Court now is Defendants' Motion for Summary Judgment, [Dkt. 37] seeking an order that their records search was adequate and that they properly withheld and redacted information requested by Plaintiffs. For the following reasons, Defendants' Motion is granted in part and denied in part.

I.  <u>Background</u>

All facts recited below are asserted in the Complaint [Dkt. 1], the parties'

Local Rule 56(a) Statements [Dkts. 37-2, 40-1], and the summary judgment briefing and substantiated by admissible evidence filed as exhibits.  The Court presents the facts in the light most favorable to the nonmoving party—here, Plaintiffs—after drawing all reasonable inferences in their favor.  *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000).

Plaintiffs submitted three requests for records to Defendants pursuant to the Freedom of Information Act.[1]  [Dkt. 37-2 (Defs.' L. R. 56(a)1 Statement) at ¶ 6]. Five branches of the armed forces—the Air Force, Army, and Navy and Marine Corps within the DOD, and the Coast Guard within DHS—conducted searches and issued responses to the requests.  *Id.* at ¶ 10.  Defendants detailed their efforts in declarations and *Vaughn* indices attached to the motion for summary judgment.  *Id.* ¶ 11.  Defendants produced certain documents, some of which were redacted, and withheld other documents.

The parties discussed the materials redacted and withheld and present the following discovery disputes for the court to resolve: first, whether the search for documents responsive to Item #7 of the Second Request was legally adequate; second, whether Defendants' properly withheld information protected by privilege under Exemption 5; and third, whether Defendants' properly withheld biographies and redacted from disclosed documents the names of personnel at

---

[1] The July 6, 2017 Requests (the "First Requests") to all relevant DOD and DHS components concerned the Military Whistleblower Protection Act ("MWPA").  *Id.* at ¶ 7.  The July 14, 2017 Requests (the "Second Requests") to all relevant DOD and DHS components concerned the "Military Justice System."  *Id.* at ¶ 8.  The August 23, 2017 Requests (the "Third Requests") to all relevant DOD components concerned the Boards for Correction of Military Records ("BCMRs").  *Id.* at ¶ 9.

the rank of Colonel and below under Exemption 6.  *Id.* at ¶ 1; [Dkt. 40-1 (Plfs.' Rule

56(a) Statement) at ¶1].

### A. Response to Second Request Item #7

Item #7 of the Second Requests sought information regarding the Air Force

"race and discipline working group" (the "Working Group" or "Group"), referred

to by Plaintiffs as the "Air Force's diversity team."[2]  [Dkt. 37-2 at ¶ 12; Dkt. 48-10

at p. 3 ¶ 5].  Three Air Force offices[3] were involved in the Working Group—the

Headquarters Office, the Secretary's Office, and the JAG Office.[4]  *Id.* at ¶¶ 24-25.

The Headquarters Office served as the lead office for the study and generation of

written work for the Working Group, with the Group's Study Director and Lead

Data Analyst assigned to that office.  [Dkt. 48-10 at ¶ 5].  The Working Group

---

[2] The Request reads: "7.  Any and all information regarding the creation and performance of the Air Force's diversity team.  Such information includes, but is not limited to:
   a.  If and when the diversity team was created.
   b.  The names of the members who are on the diversity team.
   c.  The qualifications of each member of the diversity team.
   d.  Any findings by the diversity team.
   e.  Any recommendations by the diversity team.
   f.  Whether witnesses were called to testify in front of the diversity team."
[Dkt. 37-2 at ¶¶ 14-15].

[3] Defendants provide full names and corresponding acronyms for the three offices. *See* [Dkt. 37-1 at 5-6].  The names and acronyms are cumbersome, and the Court therefore assigns shorthand names for each.  They are as follows: the Headquarters Air Force Diversity and Inclusion, Manpower, Personnel, and Services ("HAF/A1DV"), referred to in this decision as the "Headquarters Office"; the Secretary of the Air Force for Manpower and Reserve Affairs ("SAF/MR"), referred to in this decision as the "Secretary's Office"; and the Air Force Judge Advocate General ("AF/JA"), referred to in this decision as the "JAG Office."

[4] The Study Director from the Headquarters Office, the initial lead from the JAG Office, and the advisor, Equal Opportunity Subject Matter Expert, from the Secretary's Office took the lead in creating the Working Group.  [Dkt. 37-10 (Jones Suppl. Decl.) ¶ 5].

convened from April 2016 to June 2016.  [Dkt. 37-2 at ¶ 47; Dkt. 48-10 (Jones Second Suppl. Decl.) at ¶ 5].  The Declarations of Colonel Jones, currently, and at all relevant times, the Chief of the Headquarters Office, provide background regarding the Working Group, relevant file systems, and search efforts concerning Item #7.  [Dkt. 37-2 at ¶¶ 14-15].

The Headquarters Office was deemed most likely to have responsive documents based on its role in the Working Group.  [Dkt. 48-10 at ¶¶ 5, 7].  Air Force personnel conducted initial searches of the Headquarters Office shared network drive using search terms[5] in February and March 2018.  [Dkt. 37-2 at ¶ 16; *see also* Dkt. 40-1 at ¶ 16; Dkt. 21 (3.12.2018 Status Report) at 9].  The Deputy Director of the Analyses Foundation & Integration Division—the office responsible for leading, carrying out, reviewing, and ensuring the analytic integrity of studies conducted throughout the Air Force—searched email records.  [Dkt. 37-2 at ¶¶ 17-19; Dkt. 37-8 (Jones Decl.) at ¶ 6].  The initial searches produced the "Talking Paper on Air Force Military Justice System Diversity Efforts" (the "Talking Paper"), which relates to the creation and performance of the Working Group.  [Dkt. 37-2 at ¶ 20; Dkt. 48-10 at ¶ 6].

On April 16, 2018, the Air Force Legal Operations Agency requested supplemental searches for additional records relating to the creation of the Group and its work on court martials.  [Dkt. 37-2 at ¶ 21-22; Dkt. 48-10 at ¶ 4].  The

---

[5] Defendants represent that they used the search terms "race" and "justice," though an earlier status update from the parties states that Defendants used the search phrase "race and justice."  [Dkt. 37-2 at ¶ 16; Dkt. 40-1 at ¶ 16; Dkt. 21 (3.12.2018 Status Report) at 9].

Headquarters Office conducted supplemental searches between May 22, 2018 and June 18, 2018. *Id.* at ¶ 30; [Dkt. 37-10 at ¶ 7]. Those conducting the searches did not use the provided agreed upon search terms.[6] *See* [Dkt. 37-2 at ¶¶ 22-23]. They unilaterally limited the scope of the search after determining that the terms were overly broad. [Dkt. 48-10 at 10].

The member of the Working Group who was familiar with its formation and performance, and knowledgeable about Headquarters Office files, determined that the Headquarters Office shared network drive was the most likely location to have responsive records and searched the locations on the shared drive mostly likely to contain such records. [Dkt. 48-10 at ¶ 7; Dkt. 37-2 at ¶ 31; Dkt. 37-10 at ¶ 7]. The member also reviewed emails in his/her account from April through June 2016, the time period during which the Group convened. [Dkt. 37-2 at ¶¶ 40-41; Dkt. 37-10 at ¶ 8]. With the exception of the one responsive email identified, the resulting responsive documents concerned the performance of the Working Group. [Dkt. 48-10 at ¶ 8].

Other members involved in the formation of the Working Group—including the initial and final JAG Office leads, [Dkt. 37-10 at ¶ 11-12; Dkt. 37-2 at ¶ 50-57], and the Special Assistant to the Secretary's Office, [Dkt. 37-2 at ¶ 59-62]—were asked to conduct a limited search of their email accounts for emails specifically relating to the Group's formation.[7] *Id.* at ¶ 9; [Dkt. 37-2 at ¶ 42]. The Secretary's Office also

---

[6] Plaintiffs requested use of the following search terms: "diversity," "diversity team," "inclusion," "diverse backgrounds," "inclusive," or "demographics." [Dkt. 37-2 at ¶¶ 22-23].

[7] Defendants' Rule 56(a) Statement represents that the JAG leads were not asked for emails regarding the Group's performance "because that was not AF/JA's role;

determined that it did not have responsive records on its shared drive.  [Dkt. 37-2 at ¶ 60].

Colonel Jones's Second Supplemental Declaration claims that "[a]ll USAF personnel involved in the searches identified relevant locations based on their expertise and knowledge of USAF records and recordkeeping[]" and "concluded that there were no other locations reasonably likely to have responsive records." [Dkt. 48-10 at ¶ 11].

### B. Exemption 5 Withholdings

DOD withheld documents and information claiming deliberative process and attorney client privilege under Exemption 5.  *Id.* at ¶ 91.  Exemption 5 disputes remain as to four documents—9-E, 9-G, 9-H, and 9-I.[8]  [Dkt. 48 at 9].

### C. Exemption 6 Withholdings

Plaintiffs seek Staff Judge Advocate ("SJA") biographies from each component.  [Dkt. 37-2 at ¶ 63].  Defendants withheld these biographies under Exemption 6, which protects information in personnel and medical files and similar files when disclosure would constitute a clearly unwarranted invasion of privacy. Plaintiffs seek the biographies in full and dispute the extent to which they are considered private, treated as confidential, and distributed to non-DOD personnel. [Dkt. 40-1 at ¶¶ 64-65, 67-68, 72, 79, 85].

---

it was instead the role of HAF/A1DV."  [Dkt. 37-2 at ¶ 58].  However, the source cited for that contention does not state that the JAG Office had no role in the Group's performance.  *See* [Dkt. 37-10 at ¶ 7].

[8] After Plaintiffs filed their Opposition to the Motion for Summary Judgment, Defendants withdrew Exemption 5 claims on 7 of documents (Exs. 9-A, 9-B, 9-C, 9-D, 9-F, 9-G, and 9-I) and produced those documents to Plaintiffs for the first time or with revised redactions on December 10, 2018.  [Dkt. 48 at 9].

Defendants also withheld personal identifying information of government and military personnel at the rank of Colonel (O-6) and below pursuant to Exemption 6.  [Dkt. 37-2 at ¶¶ 86-89].  Plaintiffs argue that they are entitled to identifying information for individuals at the rank of Colonel.

## II.   Standard of Review

"FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed."  *Grand Cent. P'ship., Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quotation marks omitted).  FOIA reflects "a general philosophy of full agency disclosure," *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976) (quotation marks omitted), and "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies," *Halpren v. F.B.I.*, 181 F. 3d 279, 286 (2d Cir. 1999).

"The agency must disclose its records 'unless its documents fall within one of the specific, enumerated exemptions set forth in the Act.'"  *Associated Press v. United States Dep't of* Defense, 554 F.3d 274 (2d Cir. 2009) (quoting *Wood v. F.B.I.*, 432 F.3d 78, 82-83 (2d Cir. 2005)).  "In keeping with the policy of full disclosure, the exemptions are narrowly construed with doubts resolved in favor of disclosure."  *Halpren*, 181 F.3d at 287 (quotation marks omitted).

"As with all motions for summary judgment, summary judgment in a FOIA case is appropriate only when the . . . materials submitted to the Court show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Serv. Women's Action Network v. Dep't of Def.*, 888

F. Supp. 2d 231, 240 (D. Conn. 2012) (quotation marks omitted) (hereinafter "*SWAN I*").  "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to FOIA."  *Carney v. United States Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).  That burden remains with the agency when seeking to justify redaction of identifying information.  *Associated Press*, 554 F.3d at 284.  "Redaction, however, is 'expressly authorized by FOIA,' which indicates that Congress 'recognized that the policy of informing the public about the operation of its Government can be adequately served in some cases without unnecessarily compromising individual interests in privacy.'"  *Id.* (quoting *United States Dep't of State v. Ray*, 502 U.S. 164, 174 (1991)).

To sustain its burden, the agency may rely on "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents falls within an exemption."  *Carney*, 19 F.3d at 812.  "Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face.  When this is the case, the district court may forgo discovery and award summary judgment on the basis of the affidavits."  *Id.* (quotation marks and citations omitted).  The good faith presumption, however, only applies to agency affidavits that are non-conclusory and "reasonably detailed."  *Halpren*, 181 F.3d at 295.

8

III.   **Discussion**

Defendants move for summary judgment on each of the three contested issues, arguing that as a matter of law (1) their search for information responsive to Item #7 was adequate, (2) withholdings pursuant to Exemption 5 are proper, and (3) withholdings pursuant to Exemption 6 are proper.  [Dkt. 37 (Mot. Summ. J.); Dkt. 37-1 (Mot. Summ. J. Mem.)].  Plaintiffs argue that Defendants have not met their burden and summary judgement is not appropriate.  [Dkt. 40 (Opp'n Mem.)].

A.   **Adequacy of Air Force Search of Records Responsive to Second Request Item #7**

To prevail on summary judgment when the adequacy of an agency's search is at issue, "the defending agency must show beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007).  To meet this burden, agency declarations "should provide reasonably detailed information about the scope of the search and the search terms or methods employed" and "must also aver that all files likely to contain responsive materials (if such records exist) were searched." *SWAN I*, 888 F. Supp. 2d at 244-45.  "If . . . the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  *New York Times Co. v. United States Dep't of Defense*, 499 F. Supp. 2d 501, 517 (S.D.N.Y. 2007) (quoting  *Campbell v. United States Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998)).

In Item #7 of their Second Request, Plaintiffs sought information regarding the creation and performance of the "Air Force's diversity team"—including when it was created, names and qualifications of members, findings and

9

recommendations of the team, and whether any witnesses were called to testify.[9] [Dkt. 37-2 at ¶ 12].  In their Opposition Memorandum, Plaintiffs argue that the Air Force failed to adequately explain its relevant file systems and its method of searching, and that the Air Force ignored portions of Plaintiffs' request when conducting the searches.  [Dkt. 40 at 9].  Defendants argue that the evidence establishes that DOD properly discharged its FOIA obligations in searching for and responding to Item #7 of Plaintiff's Second Request.

Defendants provide three declarations from Colonel Jones establishing Defendants' efforts to search for records responsive to Item #7.  *See* [Dkt. 37-8 (Ex. 5 Jones Decl.); Dkt. 37-10 (Ex. 7 Suppl. Jones Decl.); Dkt. 48-10 (Ex. 21 Second Suppl. Jones Decl.)].  Defendants' provided the Second Supplemental Jones Declaration, which provides notable additional detail regarding the file systems and searches, with their Reply Memorandum, after submission of Plaintiffs' Opposition. As laid out below, the Court concludes that the totality of Defendants' submissions sufficiently describes the file systems and searches but that those searches were inadequate.

### 1.    Description of Files and Searches

Defendants first confirmed with Plaintiffs that the "the Air Force's diversity team" was meant to refer to the Working Group identified in the "Talking Paper on Air Force Military Justice System Diversity Efforts" (the "Talking Paper").  [Dkt. 48-10 at p. 3 ¶ 5].  Three Air Force offices were involved in the Working Group: the

---

[9] *See supra* at footnote 2 for the full text of the request.

Headquarters Office,[10] the Secretary's Office,[11] and the JAG Office.[12]  [Dkt. 37-2 at ¶¶ 24-25].  The Group convened for 90 days, between April and June 2016.  [Dkt. 48-10 at p. 3 ¶ 5].  The Headquarters Office served as the lead for the study and generation of written work for the Group, with the Group Study Director and Lead Data Analyst both assigned to the Headquarters Office.  *Id.* at ¶ 5.  As a result, Defendants determined that it was the most likely office to have responsive documents.  *Id.* at ¶¶ 5, 7.

Colonel Jones's declarations explain that the Air Force has a decentralized file management system, with each organization managing and maintaining its own files.  [Dkt. 48-10 at ¶ 3].  Each organization has a shared network drive with an Electronic Records Management folder containing the organization's official records.  *Id.*  Personnel within each organization also have access to and may store records on a personal drive, the H drive, which requires a Common Access Card ("CAC") to access.  *Id.*  This file system, along with former Working Group members' personal knowledge, led Defendants to conclude that responsive documents would most likely reside on the Headquarters Office shared network drive.  *Id.*

Air Force personnel have an email account controlled at the local organizational level.  [Dkt. 37-2 at ¶¶ 34-35].  They receive a new email account, and lose access to their old account, when they have a permanent change of station

---

[10] The Headquarters Air Force, Diversity and Inclusion, Manpower, Personnel, and Services Office ("HAF/A1DV").
[11] The Secretary of the Air Force for Manpower and Reserve Affairs Office ("SAF/MR").
[12] The Air Force Judge Advocate General Office ("AF/JA").

("PCS"). *Id.* at ¶¶ 37-38. Unless an individual creates a back up of his/her emails to another medium prior to a PCS, he/she will lose all emails from the earlier account. *Id.* at ¶ 39.

Considered in their entirety, the Court concludes that Defendants did not adequately describe their filings systems and searches, as required to allow the Court to determine whether the relevant locations were searched, for the reasons described below. *See El Badrawi v. Dep't of Homeland Security*, 583 F. Supp. 2d 285, 300 (D. Conn. 2008) ("[T]his court, other courts in this Circuit, and the D.C. Circuit, have all held that affidavits describing a search must detail files searched and the general scheme of the agency file system. . . . Without at least an elementary description of the general scheme of an agency's file system, a FOIA requester has no basis upon which to dispute an agency's assertion that any further search is unlikely to disclose additional relevant information." (internal citations, quotation marks, and brackets omitted)).

Headquarters Office personnel and the Deputy Director of the Air Force Analyses Foundation & Integration Division conducted an initial search of their emails and the Headquarters Office shared network drive in late February and early March 2018. [Dkt. 37-2 at ¶¶ 16-20; Dkt. 37-8 at ¶ 6; Dkt. 48-10 at ¶ 6]. Defendants represent that they used the search terms "race" and "justice," though an earlier status update from the parties states that Defendants did not use these individual terms, but rather used the search phrase "race and justice" which would necessarily yield fewer results. *Id.* at ¶ 16; Dkt. 40-1 at ¶ 16; Dkt. 21 (3.12.2018 Status Report) at 9]. It is unclear what search terms were used and it is also unclear

12

what folders on the Headquarters Office shared network drive were searched using the terms.

Supplemental searches were conducted between May and June 2018.  [Dkt. 37-2 at ¶¶ 30; Dkt. 37-10 at ¶ 7].   The Headquarters Office Chief of Strategic Communications, a former member of the Working Group familiar with its formation and performance and knowledgeable about the Headquarters Office files, searched the locations on the shared network drive most likely to contain responsive records.  [Dkt. 48-10 at ¶ 7; Dkt. 37-2 at ¶ 31; Dkt. 37-10].  That individual determined that use of the supplemental search terms provided by Plaintiffs[13] would lead to overinclusive results.  [Dkt. 48-10 at 10].  Specifically, according to Colonel Jones's declaration, use of the search terms would have returned records from not only the Headquarters Office Working Group, but many other Air Force organizations that were part of the larger USAF Diversity and Inclusion team, such as the civilian and military Equal Opportunity programs, the Air Force Personnel Center, which conducts its own demographics studies, and Development Teams, which conduct barrier analyses on career fields and processes.  *Id.*  Defendants provide no explanation for why the search terms could not have been used on a more limited set of folders if, as Colonel Jones's declarations indicate, former working group members were able to identify the relevant locations.  Additionally, Defendants do not explain why they failed to propose alternative search terms rather than abandon them altogether.

---

[13] The provided search terms include "diversity," "diversity team," "inclusion," "diverse backgrounds," "inclusive," or "demographics."  *Id.* at ¶ 10.

13

The Court took considerable effort to piece together the information in the three declarations of Colonel Jones regarding the searches.  Even doing so, the Court was unable to discern a clear structure of the drives, folders, and files that Defendants did and did not search.  The declarations explain that each office has a separate shared network drive, that each individual has access to a private H drive, and that each individual has an email account for each position which he/she loses access to upon a PCS.  *See* [Dkt. 48-10 at ¶ 10].  They do not, however, explain what folders within the shared network drive the former group members identified and searched or why use of the recommended, or any, search terms was unworkable.

2.    Adequacy of Searches

Based on the information Defendants do provide, the Court concludes that Defendants' searches were not reasonably calculated to uncover all responsive materials.

First, while Colonel Jones declares that the Headquarters Office and Secretary's Office searched their shared network drives, Defendants provide no indication that the JAG Office searched its shared network drive.  Defendants do not provide a satisfactory explanation for this.  Even though the Headquarters Office led efforts to create Group work product, the possibility that members saved responsive documents to their respective office shared network drives is not out of the question.  The Secretary's Office searched its drive and confirmed it contained no responsive documents.  The JAG Office should have done the same.

Second, Colonel Jones's declarations explain that five former members of the Working Group searched their emails—the Study Director, Chief of Strategic

14

Communications of the Headquarters Office, the initial and final JAG Office leads, and the Special Assistant to the Secretary's Office. Defendants do not explain why the rest of the former Group members were not asked to search their emails as well. According to the Talking Paper, there were nineteen members of the Working Group, and yet only four searched their emails for responsive documents. It is entirely possible that members of the Working Group outside of the office leads communicated via email regarding the Working Group and may have responsive emails as a result. While it is possible that any number of those former members will have had a PCS at this point and may no longer have access to their emails from the relevant time period, Defendants did not explore this potential source of responsive documents to find out.

Finally, as Plaintiffs point out, *see* [Dkt. 40 at 10-11], the searches of those members who did search their emails did not cover the full relevant time period. The Study Director was asked to search emails from between January 2016 and May 5, 2016, despite the fact that the Group met through June 2016. *Id.* Additionally, the JAG Office final lead limited his/her search for records to those relating to the formation of the Working Group—he/she had no such documents because he/she was not a part of the Working Group during the formation period— and did not search for emails from the time he/she was involved in the performance of the Group. *See* [Dkt. 37-10 at ¶¶ 11-12].

The Court agrees that Defendants improperly limited the searches of the Study Director and the JAG Office final lead, which should have included emails relating to the performance, in addition to the creation, of the Working Group.

15

Defendants contend that the Headquarters Office personnel had already searched the relevant files and located the documents relating to the Working Group's performance.  *See* [Dkt. 48 at 3-4; Dkt. 48-10 at ¶¶ 7-9].  Because of this, apparently, the Study Director was tasked with identifying emails relating only to the Group's creation.  *See* [Dkt. 48 at 3-4; Dkt. 37-10 at ¶¶ 7-9; Dkt. 48-10 at ¶ 9].  Identification of certain responsive documents related to the Group's performance, however, does not necessarily mean that there are no additional documents concerning the Group's performance in other locations.  It is reasonable to believe that the Study Director, and potentially other Working Group members, had emails about not only the Group's formation but also its performance unique from those records saved on the shared network drive or in another member's email records.  Defendants have not provided a legitimate reason to believe otherwise.

Defendants represent that the JAG Office final lead was not asked for such records because "that was not AF/JA's role."  [Dkt. 37-2 at ¶ 58].  Colonel Jones's declaration does not directly support this explanation.  *See* [Dkt. 40-1 at ¶ 58]. Colonel Jones's second supplemental declaration does explain that the Headquarters Office "served as the primary lead for the study and generated any written work for the group."  [Dkt. 48-10 at ¶ 5].  But no declaration provides a reasonable explanation for why this eliminates the possibility that Working Group members from other offices may have emails or other records regarding the Group's performance.

Defendants' searches were not reasonably calculated to discover all responsive documents because the JAG Office did not search its shared network

and because only four of the Group's nineteen members searched their emails, and at least two of those that did search imposed an inappropriately limited time period. Colonel Jones's generalized statement that "[a]ll USAF personnel involved in the searches identified relevant locations based on their expertise and knowledge of USAF records and recordkeeping[]" and "concluded that there were no other locations reasonably likely to have responsive records" does not diminish the fact that the detailed explanation of the searches conducted reveals multiple deficiencies.  [Dkt. 48-10 at ¶ 11].   Accordingly, Defendants' motion for summary judgment on the adequacy of its search for records responsive to Item #7 is DENIED.  Defendants are ORDERED to conduct the additional searches necessary to make a reasonable effort to locate all documents responsive to Plaintiffs' Second Request Item #7.

## B.  Exemption 5

Exemption 5 protects records that are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  In other words, "[a]gency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5."  *Grand Cent. P'ship v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999) (quoting *Providence Journal Co. v. United States Dep't of the Army*, 981 F.2d 552, 557 (1st Cir. 1992)).  This exemption encompasses attorney-client privilege as well as the deliberative process privilege, which is part of the executive privilege.  *See id.*  The Second

Circuit has explained that Exemption 5 was:

> designed to safeguard and promote agency decisionmaking processes in at least three ways: It serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*Id.* (quoting *Providence Journal Co.*, 981 F.2d at 557) (internal quotation marks omitted).   Accordingly, prior case law examining the exemption "focuses on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."   *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. United States Dep't of Justice*, 697 F.3d 184, 194 (2d Cir. 2012) (hereinafter "*Brennan Ctr.*") (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)).

Defendants claim deliberative process privilege and/or attorney-client privilege with respect to all or part of four documents—Exhibits 9-E, 9-G, 9-H, and 9-I. [Dkt. 48 at 9-10].  To prevail on its motion, Defendants' declarations and *Vaughn* indices must provide "reasonably detailed explanations why any withheld documents fall within an exemption."  *Carney*, 19 F.3d at 812.

### 1.      Deliberative Process Privilege

A document must be both "predecisional" and "deliberative" to qualify for the deliberative process privilege.  *Grand Cent. P'ship*, 166 F.3d at 482.  A document is predecisional when it is "prepared in order to assist an agency decisionmaker in arriving at his decision."  *Id.* (quoting *Hopkins v. United States Dep't of Hous. and*

*Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991)).  A document is "deliberative" when it is "actually related to the process by which policies are formulated." *Id.* (quoting *Hopkins*, 929 F.2d at 84)).  The privilege protects "recommendations, draft documents, proposals, suggestions, and other substantive documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* (quoting *Ethyl Corp. v. United States Envtl. Prot. Agency*, 25 F.3d 1241, 1248 (4th Cir. 1994)).  The privilege "focuses on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Id.* (quoting *Hopkins*, 929 F.2d at 84-85) (internal quotation marks and brackets omitted).

Even if a document is "predecisional" and "deliberative," it falls outside the scope of Exemption 5 protection "when the document is more properly characterized as an opinion or interpretation which embodies the agency's effective law and policy, in other words, its working law[.]" *Brennan Ctr.*, 697 F.3d at 195 (quoting *Sears*, 421 U.S. at 153) (internal quotation marks and brackets omitted).  In other words, a document claimed to be exempt must be disclosed "if it closely resembles that which FOIA affirmatively requires to be disclosed: 'final opinions . . . made in the adjudication of cases,' 'statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register,' and ' administrative staff manuals and instructions to staff that affect a member of the public.'" *Id.* (quoting 5 U.S.C. § 552(a)(2)(A)-(C)).  "The exemption, 'properly construed, calls for disclosure of all opinions and interpretations which embody the agency's effective law and policy, and the

withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" *Id.* (quoting *Sears*, 421 U.S. at 152) (internal quotation marks omitted).

Plaintiffs' Opposition argues that the withheld information in 7 disputed documents (Exhibits 9-A, 9-B, 9-C, 9-D, 9-F, 9-G, 9-H) is "working law" which Exemption 5 does not protect.  [Dkt. 40 at 17, 19-20].  With their Reply, Defendants withdrew certain redactions and submitted revised redactions for the remaining documents.  *See* [Dkt. 48 (Reply & Exs.)].  Defendants maintain redactions which Plaintiffs originally disputed in only two documents (Exhibits 9-G, and 9-I). Plaintiffs did not seek leave to file a sur-reply and the Court therefore does not know whether Plaintiffs object to the remaining redactions or whether Defendants' removal of a significant portion of the redactions remedies Plaintiffs' concerns. The Court will consider the remaining redactions to each document still potentially in dispute in turn.

### i.   Exhibit 9-E

Defendants assert and argue the appropriateness of Exemption 5 redactions to Exhibit 9-E.  Plaintiffs' Opposition does not address these redactions. Accordingly, the Court considers Plaintiffs to have withdrawn any objections to the Exemption 5 redactions to Exhibit 9-E, but will address them briefly nonetheless.

Exhibit 9-E is an email chain from April 1 and 2, 2016 with the subject line "RE: Board's Authority to Correct IG Records."  [Dkt. 48-6 (Ex. 9-E)].  Defendants have redacted information from the first and second emails in time.  *Id.*  The first email is from Air Force personnel, addressed to multiple recipients, the unredacted

portions of which provide facts concerning a specific case before the Air Force Board for Correction of Military Records.  *Id.*  The unredacted portions request that the recipients "advise when [they] have an opportunity" regarding "the authority of [their] respective Boards to correct IG [Inspector General] records."  *Id.* at 2.  The first response to that request is redacted in full.

The Declaration of Rita Sono states that "the withheld information relates to varying opinions and advice about how to approach different issues affecting the Air Force Board for Correction of Military Records," characterizing the responses as predecisional "preliminary assessments[.]"  [Dkt. 48-11 (Sono Decl.) at ¶ 6].  The *Vaughn* Index characterizes the withheld information as "Government deliberation" regarding policies surrounding the AFBCMR's authority to correct Inspector General records.  [Dkt. 37-7 at PDF p. 39].  Specifically, they "relate[] to Department of Defense personnel's varying positions and opinions about the appropriate methodology for handling cases that involve correcting Inspector General records."  [Dkt. 48 at 10; *see also* Dkt. 48-11 at PDF p. 7-8].

The declaration and *Vaughn* Index, along with the unredacted portions of the email, provide the date, names, subject, content and purpose of the email and convince the Court that the withheld information is protected by the deliberative process privilege.  According to the declaration and *Vaughn* Index, the redacted content provides opinions of multiple individuals regarding the handling of requests to correct records, but does set out agency practice or procedure which would constitute working law and therefore require disclosure.  Because these opinions are part of a process of determining an ultimate practice or policy, they

are predecisional and deliberative and thus protected by Exemption 5.

ii.   <u>Exhibit 9-G</u>

Exhibit 9-G is an email chain from April 29, 2014 to May 1, 2014 with the subject line "RE: PLEASE READ!! GREEN TAGS."  [Dkt. 48-8 (Ex. 9-G)].  The email chain addresses requirements for advisories submitted by personnel in order for a case to be processed as a Green Tag.  *Id.*  The initial email sets out the requirements and several scenarios for processing of a case if those requirements are or are not met.  *Id.* at 2-3.  Defendants withheld two limited portions of a response to that initial email, one of which is immediately preceded by the phrase, "I'd recommend a." *See id.* at 1.  The unredacted portions of the email indicate that it concerns follow-up considerations regarding the original guidance.  *Id.*

Plaintiffs' Opposition took issue specifically with the redactions to the bottom of page 3 and extending to page 5, contending that those portions include instructions to staff regarding the AFBCMR Green Tag program policy.  [Dkt. 40 at 24-25].  Defendants have lifted those redactions.  [Dkt. 48-4].  With respect to the other redactions to the email chain, Plaintiffs argued that Defendants' claims that the email "includes deliberative discussions on specific AFBCMR procedural requirements" is overly broad and sweeping and fails to specify the role the document played in the agency's consultative process and whether it reflects the views of the author rather than the policy of the agency.  [Dkt. 40 at 25].

The Sono Declaration, which Defendants filed with their Reply after Plaintiffs' Opposition, represents that the redacted portions of the email chain include preliminary "opinions and advice" regarding how to address issues affecting the

Air Force Board for Correction of Military Records.  [Dkt. 48-11 at ¶ 6].  The *Vaughn* Index entry characterizes the withheld portions as "[d]eliberative discussions" concerning specific AFBCMR procedural requirements.  [Dkt. 37-7 (McIntosh Decl., Ex. E) at PDF p. 33]   Specifically, they include "opinions and recommendations" regarding "how to implement a new advisory template, as well as, [sic] what procedural changes should be created in order to provide adequate feedback to offices that write advisory opinions."  [Dkt. 48-11 at PDF p. 8].

Defendants removed a significant portion of their redactions to Exhibit 9-E and provided a more detailed explanation in the Sono Declaration, which is entitled to a presumption of good faith, of the nature of the portions that remain redacted. Defendants' description of the withheld content—opinions and recommendations concerning implementation of new templates and procedural changes to a feedback system—is sufficient to establish that the redactions are protected by Exemption 5's deliberative process privilege.  The unredacted portions of the email convey that the redacted ideas and opinions are not accepted policies or working law of the agency, but predecisional and deliberative.  Thus, they are not subject to disclosure under FOIA.

### iii.   Exhibit 9-I

Exhibit 9-I is the Talking Paper documenting the Working Group's findings and recommendations.  *See* [Dkt. 48-9 (Ex. 9-I2)].  The Government has withheld only the section under the heading "Recommendations."  *See id.* at 2.  The *Vaughn* Index explains that a "lower-level Air Force official" authored the report.  [Dkt. 48-11 (Sono Decl., Ex. 1) at PDF p. 9].  It further states that personnel did not brief the

report to senior Air Force or DOD leaders and that the Air Force did not adopt the recommendations.  *Id.*  The Sono Declaration reiterates these facts without elaboration.  [Dkt. 48-11 at ¶ 6].

Plaintiffs argue that Defendants fail to establish that the withheld portion is predecisional and deliberative.  First, Plaintiffs suggest that Colonel Jones's characterization of the Talking Paper as a finalized document describing the Group's recommendations to justify withholding a draft version of the Talking Paper undermines Defendants' argument that it is preliminary.  [Dkt. 40 at 30-21].  Plaintiffs further speculate without citing any facts in support that the Talking Paper recommendations may still have been informally or partially adopted, and thus constitute working law, despite having not been officially briefed or adopted by senior Air Force officials.  *Id.*

The Second Circuit has indicated that a report is necessarily predecisional if the individual or group responsible for the report lacks any authority to take final agency action and those with authority have not adopted it.  *See Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1999) ("[B]ecause HUD inspectors themselves lack any authority to take final agency action, their reports are necessarily predecisional.").  Here, the working group and the "lower-level Air Force official" who prepared the report clearly did not have authority to implement their "Recommendations," as indicated by the title of the section alone.  Nothing suggests that the Working Group established a formal or informal policy regarding these issues, but only that the Group convened to deliberate and provide input regarding the handling of them.  Indeed, the Talking Paper states that its purpose

is to "[p]rovide an overview of steps that could be taken to address potential implications of unconscious bias in the USAF military justice system." [Dkt. 48-9 at 2]. As such, the Court agrees that the section is predecisional. Finally, as intimated above, there is nothing in the record establishing any of the recommendations were adopted.

The Court is not convinced, however, that the "Recommendations" section is deliberative. Defendants have not indicated what specific agency decision the Talking Paper recommendations correlate to or verified that the Talking Paper precedes a decision to which it relates—even if that decision has not yet been made by those with authority to do so. *See Grand Cent. P'ship*, 166 F.3d at 482 (noting that "a document will be considered predecisional if the agency can also (i) pinpoint the specific agency decision to which the document correlates and (ii) verify that the document precedes, in temporal sequence, the decision to which it relates." (internal brackets and quotation marks omitted)). Nor have Defendants indicated how the Talking Paper "bear[s] on the formulation or exercise of policy-oriented judgment." *Id.* Thus, it is not clear that the Talking Paper recommendations are more than "merely peripheral to actual policy formation." *Id.* (explaining that "the privilege does not protect a document which is merely peripheral to actual policy formation"). Defendants represent that the Talking Paper was never presented to senior Air Force officials. So what concrete deliberative decision-making process the Working Group and its Talking Paper were a part of is somewhat a mystery.

As the Supreme Court explained in *NLRB v. Sears Roebuck*, the deliberative

process privilege rests "on the policy of protecting the decision making processes of government agencies . . . and [the cases] focus on documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  421 U.S. at 150 (internal citations and quotation marks omitted).  Defendants have not provided the Court with sufficient information to determine whether the withheld information in the Talking Paper is part of any real governmental decision making process rather than simply an exercise which went nowhere.  Defendants have not justified protection of the withheld information sufficient under Exemption 5 and their motion for summary judgment on this issue is DENIED.  *See Carney*, 19 F.3d at 812.

### 2.    Attorney Client Privilege

Exemption 5 also encompasses the attorney-client privilege.  "The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance."  *Brennan Ctr.*, 697 F.3d at 207 (citation omitted).   "The attorney-client privilege protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance."  *Id.* (citation omitted).  As with the deliberative process privilege, "the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy."  *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 360 (2d Cir. 2005).

### i.    Exhibit 9-H

Defendants withheld Exhibit 9-H in its entirety under the attorney-client privilege. [Dkt. 48-10 at ¶ 5]. The Sono Declaration states, "The record relates to legal advice from the Administrative Law Division of the Air Force Office of the Judge Advocate General to the Air Force Board for the Correction of Military Record about specific questions the Board raised about how to process certain applications." *Id.* The supplemental *Vaughn* Index indicates the same. [Dkt. 48-11 at PDF p. 9]. Defendants represent that "[t]he document was written by a member of the Administrative Law Division, Office of The Judge Advocate General, Air Force Headquarters, in response to the AFBCMR's request for a review and opinion regarding the Military Whistleblower Protect Act." [Dkt. 37-1 at 38-39]. They further explain that it "responds to specific factual questions from the agency to its attorney about how to process certain applications, not how to address a hypothetical fact pattern." [Dkt. 48 at 11].

Prior to Defendants' Reply filings, Plaintiffs argued that the document constitutes general policy guidance that must be affirmatively disclosed. [Dkt. 40 at 28]. Requests for advice from counsel regarding processing of specific applications based on specific sets of facts, rather than generally applicable guidance, however, is not working law subject to disclosure. The Sono Declaration and supplemental *Vaughn* Index entry indicate that the withheld document included advise from counsel to the AFBCMR "regarding specific questions the Board raised about how to process *certain* applications." [Dkt. 48-11 at 9]. Protection of the specific request and legal advice provided serves "the principal rationale behind the attorney-client privilege—to promote open communication

between attorneys and their clients so that fully informed legal advice may be given."  *Nat'l Council of La Raza*, 411 F.3d at 360.  Defendants' description of the advice provided by counsel gives no indication that it is an authoritative interpretation within the  agency.  *See id.*  Accordingly, the Court holds that Exemption 5 protects Exhibit 9-H.

C. <u>Exemption 6</u>

Defendants argue that they properly withheld and redacted the following information pursuant to Exemption 6: (1) withholding by all components of SJA biographies; (2) redaction of Colonels/Captains' (Rank O-6) and their civilian equivalents' names in all responses to the First and Third Requests and in Air Force's response to the Second Requests; and (3) redaction of names of the members of the Air Force race and discipline Working Group.  [Dkt. 37-1 at 20].

Exemption 6 protects information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). In determining whether identifying information may be withheld pursuant to Exemption 6, the Court must (1) "determine whether the identifying information is contained in 'personnel and medical files and similar files'" and (2) "balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy."  *Associated Press*, 554 F.3d at 291.

1.  <u>"Personnel and Medical Files and Similar Files"</u>

Defendants admit that the redacted documents are not personnel or medical

files, but argue that they "contain information sufficient to bring them within the broad reading that courts have given to the 'similar files' language in Exemption 6." [Dkt. 37-1 at 21].

Based upon a review of the legislative history of FOIA, the Supreme Court held in *United States Department of State v. Washington Post Co.* that the term "similar files" is to be interpreted broadly, rather than narrowly, explaining that Exemption 6 was enacted "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." 456 U.S. 595, 599-603 (1982). The personnel, medical, and similar files aspect of the exemption is not meant to serve as a limiting factor. *Id.* at 600; *see also Wood*, 432 F. 3d at 87 n.6. Instead, "the 'clearly unwarranted invasion of personal privacy' language . . . holds Exemption 6 'within bounds.'" *Washington Post Co.*, 456 U.S. at 600.

"[T]he primary concern of Congress in drafting Exemption 6 was to provide for the confidentiality of personal matters." *Id.* at 599-600. Thus, "the exemption was intended to cover detailed Government records on an individual which can be identified as applying to that individual." *Id.* at 602 (quoting H.R. Rep. No. 1497 89th Cong., 2nd Sess., 11 (1966), U.S. Code Cong. & Admin. News 1966, pp. 2428) (internal brackets omitted). In other words, "[w]hen disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether the release of the information would constitute a clearly unwarranted invasion of a person's privacy." *Id.* "Information unrelated to any particular person presumably would not satisfy the threshold test." *Id.* at 602 n.4.

29

Based on this interpretation, the *Washington Post* Court held that the requested passport and citizenship information of two individuals "presumably would be found in files containing much of the same kind of information" as medical and personnel files and, therefore, qualified as "similar files." *Id.* at 600-02. Similarly, the Supreme Court previously held that case summaries of Air Force Academy's honor and ethics hearings are "similar files" because "they related to the discipline of cadet personnel" and, most significantly, because "the disclosure of these summaries implicates similar privacy values" as personnel files, for "identification of disciplined cadets a possible consequence of even anonymous disclosure could expose the formerly accused men to lifelong embarrassment, perhaps disgrace, as well as practical disabilities, such as loss of employment or friends." *Dep't of Air Force v. Rose*, 425 U.S. 352, 376-77 (1976).

In the Second Circuit, whether documents constitute "similar files" requires consideration of "whether the personal information is contained in a file similar to a medical or personnel file." *Wood*, 432 F.3d at 86. Thus, the court asks "whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file." *Id.* Such information generally includes "place of birth, date of birth, date of marriage, employment history," and other "identifying information," though not necessarily "intimate" information. *Id.* (quoting *Washington Post*, 456 U.S. at 600-01). The question then becomes whether the document at issue contains such information.

Following this analysis, the Second Circuit has held that administrative files documenting investigation into an individual's conduct qualify as "similar files" for

purposes of Exemption 6.  *Perlman*, 312 F.3d 100, 106 (2d Cir. 2002) (holding that "[t]he [Report of Investigation] is a 'detailed Government record' replete with identifying information regarding Virtue and his alleged misconduct" and thus constitutes a "similar file" under Exemption 6); *Wood*, 432 F.3d at 87 (recognizing that "the records at issue are highly detailed and contain personal information about the subjects of the investigation—the Connecticut FBI agents accused of misrepresenting search warrant information").  Similarly, the Second Circuit in *American Immigration Lawyers Association v. Executive Office for Immigration Review*, acknowledged that there was no dispute that the records of complaints against immigration judges were "similar files," satisfying the first step of Exemption 6.  830 F.3d 667, 673 (2d Cir. 2016).  In *Cook v. National Archives and Records Administration*, the Second Circuit applied the test to records of requests for archived presidential and vice-presidential materials submitted to the National Archives and Records Administration ("NARA") by or on behalf of former President George W. Bush and former Vice-President Richard B. Cheney.  758 F.3d 168, 174 (2d Cir. 2014).  The court concluded that they qualified as similar files because "they reveal what archived materials were sought from NARA, who sought those materials, and the general research topics and fields of interest of particular requestors" and thus "contain information about specific persons that can be identified as applying to those persons[.]"  *Id.*

The SJA biographies Defendants seek to withhold generally include, *inter alia*, the SJA's name, assigned duties, prior duty history, awards and decorations, published works, family status, and preservice employment.  [Dkt. 40-1 at ¶ 64].

31

These biographies include personal information along the lines of that found in a personnel file and the Court therefore concludes that they are "similar files" for the purposes of Exemption 6.

The more challenging question is whether the DOJ's blanket redaction of names of DOD employees at the rank of Colonel and below (and the civilian equivalents) in all produced documents, including those involved in the Working Group and Talking Paper, is justified under Exemption 6.  Defendants invoke a DOD standard Exemption 6 practice of redacting names of low-level employees—those at the O-6 rank and below.  [Dkt. 37-1 at 28-29; Dkt. 37-5 (Ex. 2, Herrington Decl.) at ¶ 5 (citing *O'Keefe v. DoD*, 463 F. Supp. 2d 317, 327 (E.D.N.Y. 2006))].  Accordingly, Defendants withheld names, initials, phone numbers, email addresses, social security numbers, signatures, and other claimed personally identifiable information of government and military personnel from their responses to the First and Third Requests claiming application of Exemption 6.  [Dkt. 37-2 at ¶¶ 86-89].

In 2008, the D.C. Circuit explained, "While th[e] definition of 'similar files' appears to be all encompassing, it does have limits.  For example, information that 'merely identifies the names of government officials who authored documents and received documents' does not generally fall within Exemption 6." *Aguirre v. S.E.C.*, 551 F. Supp. 2d 33, 53 (D.C. Cir. 2008).  Accordingly, the court held that the names of SEC employees referenced in documents (mostly emails) concerning the plaintiff's employment, merit pay increase, and termination were improperly redacted. *Id.* at 55.  Courts within the Second Circuit have also rejected a blanket rule for redaction of names. *See, e.g., Nat'l Day Laborer Org. Network v. U.S.*

32

*Immigration & Customs Enf't*, 811 F. Supp. 2d 713, 746 (S.D.N.Y. 2011) ("It is not the case that any mention of a federal employee's name may be withheld.  Such a blanket rule would fail both the threshold test—as to the type of file or record or information in which such information is found—and the balancing test of privacy versus public interests."); *Families for Freedom v. U.S. Customs & Border Protection*, 797 F. Supp. 2d 375, 397-98 (S.D.N.Y. 2011) (explaining that "[w]hile the privacy right protected by FOIA was not intended to turn upon the label of the file which contains the damaging information, nor is it the case that every slip of paper on which a name is written warrants protection," and holding that the documents at issue cannot be withheld under Exemption 6 because "[n]either document contains any personal or identifying information apart from the names of the authors, recipients, and persons identified[.]").

Other decisions, however, seem to disregard the threshold question or else interpret the holding of *Washington Post* so expansively as to apply to the appearance of any name of a federal employee regardless of the type of file in which it is included.  *See, e.g.*, *Am. Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp. 3d 327, 346 (D.C. Cir. 2018) ("Certainly, an individual's name constitutes information that applies to a particular individual, . . . and therefore may be subject to protection under Exemption 6[.]" (internal citations and quotation marks omitted)); *Tokar v. United States Department of Justice*, 304 F. Supp. 81, 88-89, 93-96 (D.C. Cir. 2018) (holding that the "similar files" category "has been interpreted to include personal information in public records," including names in a list of candidates for independent corporate monitors under Foreign Corrupt Practices Act); *Walston v.*

*United States Dep't of Defense*, 238 F. Supp. 3d 57, 66 (D.C. Cir. 2017) (explaining that Exemption 6 "permits exemption of not just files but bits on personal information, such as names and addresses, the release of which would create a palpable threat to privacy") (internal quotation marks and brackets omitted); *Seife v. United States Dep't of State*, 298 F. Supp. 3d 592, 623-24 (S.D.N.Y. 2018) ("The emails at issue here [concerning 'on background' briefings and conferences] are 'similar files' under Exemption 6" because "[t]hey contain the names and email addresses of agency officials, and, thus, can be identified as applying to those individuals.").

Such an interpretation of *Washington Post*, which Defendants would have this Court follow,[14] is unwarranted.   The Supreme Court explained that the exemption "was intended to cover detailed Government records *on an individual* which can be identified as applying to that individual."   *Washington Post*, 456 U.S.

---

[14] The case cited by Defendants in support of the DOD practice of redacting names of personnel at rank O-6 and below, *O'Keefe v. United States Department of Defense*, falls short of the mark here.   463 F. Supp. 2d 317, 326 (E.D.N.Y. 2006). Before acknowledging the privacy interests of low-level DOD employees in their identities, the *O'Keefe* Court held that a report by United States Central Command ("USCENTCOM") related to O'Keefe's complaints to the DOD Inspector General against his commanding officers is an administrative investigative record and thus a "similar file." *Id.* Thus, the court only performed the balancing test, recognizing the nominal value of the personally identifying information of the low rank non-decision-making investigative personnel because it first concluded that the record at issue was a "similar file."   The same goes for *Vietnam Veterans of Am. Conn. Greater Hartford Chapter 120 v. Dep't of Homeland Sec.*, in which the court held that redaction of the names of low-level DOD officials in "separation packets," essentially personnel records, of all of the service members discharged on the basis of a personality disorder was appropriate. 8 F. Supp. 3d 188, 230-31 (D. Conn. 2014).   That interest balancing analysis said nothing about the threshold requirement  because it was abundantly clear that the "separation packets" were qualifying personnel records.

at 602 (emphasis added) (internal brackets omitted).  A general training memo or talking paper concerning data on agency discrimination is not a record "on an individual."  They are records unrelated to a specific person that include names of personnel who worked on the agency matter.  The fact that agency work is attributed to a specific individual does not convert the record of that work to a "similar file."  The Second Circuit has not endorsed such an overly expansive approach and this Court declines to follow it, instead applying the Second Circuit's test in *Cook* and *Wood*.

Defendants argue that redaction of employee names is warranted under *Cook* because each document is maintained in a government file and applies to a particular individual—contains personal information identifiable to a particular person, that is, names.  [Dkt. 37-1 at 21-22].  But the *Cook* Court did not find the records to be "similar files" simply because they included names of specific individuals.  Rather, it relied on the fact that they were "detailed records containing personal information identifiable to former officials and their representatives." *Cook*, 758 F.3d at 175.  So too in *Perlman* and *Wood* the Second Circuit relied on the detailed nature of the personal information included in the records— information of a similar nature and level of detail as that included in personnel and medical records—in holding they qualified as "similar files."  *Wood*, 432 F.3d at 87 ("[T]he records at issue are highly detailed and contain personal information about the subjects of the investigation."); *Perlman*, 312 F.3d at 106 ("The ROI clearly is a 'detailed Government record' replete with identifying information[.]" (quoting *Washington Post*, 456 U.S. at 602)); *see also Associated Press v. United States*

*Dep't of Defense*, 554 F.3d 274, 291 (2d Cir. 2009) ("Since the redacted [personal letters sent to two detainees] at issue apply to the detainees whose family members seek protection, those records are 'similar files' within the meaning of Exemption 6.").

In *Wood*, the court held that personal information relating to individuals other than the subject of the investigation—third party witnesses or investigators— included in an investigative file warranted application of the balancing analysis under Exemption 6. 432 F.3d at 87 ("To the extent that the district court interpreted Exemption 6 to apply only to personal information relating to the subject of an investigation, this was error."). One could argue that protection of private information, potentially even just names, of third parties included in the investigative file suggests that that information alone results in categorization as a "similar file." However, the *Wood* Court first required that the record fall into the "medical and personnel files and similar files" category before application of the balancing analysis to any and all personal or private information included in that record. *Id.* (holding that "any personal information contained in files similar to medical and personnel files, including the type of highly detailed records found in investigative files, is subject to the balancing analysis under Exemption 6"). Thus, it was not the inclusion of the investigator and witness names that qualified the record as a "similar file," but its "highly detailed" nature and inclusion of "personal information about the subjects of the investigation" which then allowed for consideration of the interests for and against disclosure of the third-party identifying information. *Id.*

36

In addition to countless records which the Court does not have, Defendants filed as exhibits a handful of documents with redactions of employee names claiming protection under Exemption 6.  *See* [Dkt. 48-2 (Ex. 9-A2); Dkt. 48-3 (Ex. 9-B2); Dkt. 48-4 (Ex. 9-C2); Dkt. 48-5 (Ex. 9-D2); Dkt. 48-6 (Ex. 9-E2); Dkt. 48-7 (Ex. 9-F2); Dkt. 48-8 (Ex. 9-G2); Dkt. 48-9 (Ex. 9-I2)].  Defendants made no arguments as to why each of those documents qualifies as a "similar record" other than the fact that each contains identifying information of individual employees—e.g., names and email addresses.  *See* [Dkt. 37-1 at 21].  The Court's review of the orientation manuals, emails addressing Inspector General record corrections, or the Working Group Talking Paper, did not reveal any information that would qualify them as "similar files."  They do not include citizenship or passport information.  *See Washington Post*, 456 U.S. at 602.  They are not investigative files.  *Wood*, 432 F.3d at 87.  They are not detailed records of requests for records which could reveal private information about an identifiable individual.  *Cook*, 758 F.3d at 175.  As far as the Court can discern, they include no information identifiable to any individual other than names and contact information.  These documents cannot be swept up into Exemption 6 protection simply because they identify those government employees who authored or were involved in the manuals, emails, or Working Group Talking Paper.  To conclude otherwise would render useless the FOIA statute's specification that Exemption 6 apply to "medical and personnel files and similar files."

This is not to say that some other FOIA provision may permit the redaction of identifying details in records otherwise lacking in personal information.  *See* 5

U.S.C. § 552(a)(2)(E) ("To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D)."); *United States Dep't of State v. Ray*, 502 U.S. 164, 174, 174 n.9 (1991).  The Court only goes so far as to conclude that Defendants have failed to satisfy the threshold requirement with respect to their second and third categories of Exemption 6 redactions—employee and Working Group member names and contact information.  Accordingly, Defendants' motion for summary judgment as to these withholdings is DENIED.

### 2.   Balancing Privacy Rights and Public's Interest – SJA Bios

Once the threshold requirement is satisfied, "[t]he balancing analysis for FOIA Exemption 6 requires that we first determine whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012) (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008)).  This bar is low, however, requiring "only a measurable interest in privacy to trigger the application of the disclosure balancing tests." *Id.* (quoting *Fed. Labor Relations Auth. V. United States Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir. 1992)).

The analysis is context specific.  For instance, "[n]ames and other identifying information do not *always* present a significant threat to an individual's privacy interest." *Id.* (quoting *Wood*, 432 F.3d at 88)).  Whether disclosure of names is a

significant or *de minimis* threat depends upon the characteristics revealed and the consequences likely to ensue.  *Id.* at 192.  Additionally, "[i]t is not uncommon for courts to recognize a privacy interest in a federal employee's work status (as opposed to some more intimate detail) if the occupation alone could subject the employee to harassment or attack."  *Id.*

The SJA biographies include their names, work history, honors and awards, family information, and other specifics.  At least some of that information is personal and akin to that which is included in a personnel file.  The individuals have more than a *de minimis* privacy interest in such information.

Once a privacy interest is established, it "must be weighed against the public interest that would be advanced by disclosure."  *Id.*  "The only public interest cognizable under FOIA is the public 'understanding of the operations or activities of the government.'"  *Id.* (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989)).

Plaintiffs argue that Defendants have not carried their burden of showing that disclosure of the SJA biographies[15]—including the SJAs' names, rank, and professional and educational background—is a clearly unwarranted invasion of personal privacy or would subject them to annoyance or harassment.  [Dkt. 40 at 36-41].  Plaintiffs argue that SJAs are high-ranking military attorneys whose roles, and in most cases biographies, are public.  *Id.*  Plaintiffs contend that SJAs "play *the* key role in the military justice system's prosecutorial decision-making[,]"

---

[15] **Plaintiffs decided not to pursue Coast Guard SJA biographies following a "useful conversation" with Coast Guard counsel.  *See* [Dkt. 40 at 36 n.4].  Thus, only the Air Force, Army, Navy, and Marine SJA biographies are at issue.  *Id.* at 36.**

advising whether the convening authority should enter into a pretrial agreement, approving use of expert witnesses, and approving any adjudged sentence.  *Id.* (citing [Dkt. 40-2 (Ex. 1, Christensen Decl.) at ¶¶ 5, 15-16]).  They contend that SJAs names are often read into the public record during court martial proceedings, included in official press releases, published in appellate decisions, and credited in published opinions and academic works.  *Id.* at 37.  Thus, Plaintiffs argue that the information included in the biographies related to the SJAs' job functions[16] should be disclosed so that the public can determine "whether those functionally determining whether sexual assault and other violations of the Uniform Code of Military Justice should be prosecuted are qualified to do so."  [Dkt. 40 at 42].

Defendants argue that the SJAs have a great privacy interest in their biographies, including the more private family and history information as well as their work status, disclosure of which "could subject such individuals to annoyance or harassment in their private lives."  [Dkt. 37-1 at 26 (quoting Dkt. 37-5 (Ex. 2, Herrington Decl.) at ¶ 6)].  Defendants contend that SJAs are not necessarily senior officials and are not responsible for convening court-marshals, but advise the base or command authority responsible for convening court marshals.  [Dkt. 37-9 (Ex. 6, Hartsell Decl.) at ¶ 28].  Thus, they argue that disclosure of the biographies does nothing to satisfy public understanding of government operations or activities.  [Dkt. 37-1 at 26-27].

The Court recognizes Plaintiffs' stated interest in disclosure of the

---

[16] Plaintiffs do not object to redaction of purely personal information, such as hometown or family status, but do object to the characterization of preservice employment as personal.  [Dkt. 40 at 39].

professional information in the SJA biographies for purposes of evaluating those involved in making prosecutorial decisions and thus the process of making such decisions.  This is a legitimate interest.  The Court notes, however, that one's credentials are unlikely to shed much light on prosecutorial discretion misconduct based in unconscious bias.  Where one went to law school or what positions one held will not particularly illuminate whether that individual harbors bias or discriminatory tendencies.

While recognizing the limited public interest in disclosure, the Court agrees that the SJAs have a privacy interest in the personal information in their biographies.  Courts have recognized "a privacy interest in a federal employee's work status (as opposed to come more intimate detail) if the occupation alone could subject the employee to harassment or attach."  *Long*, 692 F.3d at 192.  For instance, courts have recognized that employees who worked on regulatory approval of a controversial drug, *see Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152-53(D.C. Cir. 2006), and law enforcement agents who participated in an investigation, *Wood*, 432 F.3d at 86-89, have such an interest.  In *Long*, the Second Circuit held that "the federal employees in both the sensitive agencies [including DOD] and the sensitive occupations have a cognizable privacy interest in keeping their names from being disclosed wholesale."  *Id.*  692 F. 3d at 188-89, 191 n.7.  The *Long* Court recognized DOD's practice of withholding employee names as a security measure following the September 11 attacks with the aim of making it as difficult as possible for adversaries to attack DOD personnel, as well as the concern that disclosure would permit targeting of individual federal employees and their families outside

the workplace.  *Id.*  This Court agrees that the SJAs, as DOD employees have a legitimate privacy interest in their identities given their sensitive positions.

While the SJAs have a considerable privacy interest in their identities, the public interest in disclosure of SJAs' qualifications warrants disclosure of their professional information apart from their names.  "Because exemption 6 seeks to protect government employees from unwarranted invasions of privacy, it makes sense that FOIA should protect an employee's personal information, but not information related to job function."  *Cowdry Ecker & Murphy LLC v. United States Dep't of Interior*, 511 F. Supp. 2d 215, 219 (D. Conn. 2007); *see also Sims v. Cent. Intelligence Agency*, 642 F.2d 562, 575 (D.C. Cir. 1980) ("Exemption 6 was developed to protect intimate details of personal and family life, not business judgments and relationships.).  An SJA's legal credentials and professional history are related to his/her job function.  Those credentials led each SJA to the position he/she currently holds and informs the performance of his/her duties.  Such information is not akin to a social security number, medical history, or duty station information which would give away the individual's physical location, *see Long*, 692 F.3d at 196-97, and is not "the type of information that a person would ordinarily not wish to make known about himself or herself."  *Associated Press*, 554 F.3d at 292.  Rather, this information is the type that is frequently circulated, bearing on professional credibility and qualification.

The Court concludes that the SJAs have a relatively low privacy interest in their professional information included in the biographies which Is outweighed by the public's interest in disclosure.  Accordingly, Defendants are ORDERED to

produce the SJA biographies with purely personal information redacted, including the SJA's names but not their pre-service employment history.

IV.   <u>Conclusion</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

The Court DENIES Defendants' motion for summary judgment on the adequacy of the search for records responsive to Item #7 of the Second Requests.  Defendants are ORDERED to conduct the additional searches laid out *supra* at Section III.A.2.

The Court GRANTS Defendants' motion for summary judgment as to the applicability of Exemption 5 to Exhibits 9-E, 9-G, and 9-H, but DENIES summary judgment as to Exhibit 9-I.

Finally, the Court DENIES Defendants' motion for summary judgment as to the applicability of Exemption 6 for each of the three categories of documents. Defendants are ORDERED to produce to Plaintiffs the SJA biographies with only purely personal information redacted.   Defendants are further ORDERED to reproduce the other two categories of documents without the improper Exemption 6 redactions, unless Defendants intend to assert a different basis for those redactions.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: July 12, 2019